Frank SCOTTO and Joseph F. Mangan, as Trustees of the Local 807 Labor–Management Health Fund, Plaintiffs,

v.

BRINK'S INCORPORATED, Defendant.

No. CV–86–3696.

United States District Court, E.D. New York.

Oct. 25, 1990.

As Amended Jan. 9, 1991.

J. Warren Mangan, Long Island City, N.Y., for plaintiffs.

Bickel & Brewer by Jeffrey Pagano, New York City, for defendant.

## MEMORANDUM DECISION AND ORDER

SIFTON, District Judge.

This ERISA claim is before the Court for decision following a bench trial. Plaintiffs are trustees of the Local 807 Labor Management Health Fund (the "Fund"). Defendant, Brink's, Inc. ("Brink's"), withdrew recognition from Local 807 upon expiration of their last collective bargaining agreement. Plaintiffs seek to compel defendant to make benefit contributions to the Fund based on vacation and sick pay that was allegedly earned before the expiration of the agreement but received after its expiration.

The facts are essentially undisputed, except for a question of contract interpretation. A collective bargaining agreement between Brink's and Local 807 obligated Brink's to make contributions to a multi-employer trust fund established by Local 807 under Section 302 of the Labor–Management Relations Act ("LMRA"), 29 U.S.C. § 186(g), and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002. A separate Agreement and Declaration of Trust (the "Trust"), which governs the operations of the Fund, provided that contributions shall be made pursuant to the terms of a collective bargaining agreement. Article XXXIV of the agreement provides: "Except as herein provided to the contrary, this Agreement shall be in effect as of March 21, 1983, and shall terminate at midnight as of March 18, 1984." On March 18, 1984, the agreement expired. Brink's has not made any contributions to the Fund since that date.

An initial round of litigation concerned Brink's right to withdraw recognition of Local 807 as the bargaining representative for its armored car general employees. Prior to the expiration of the agreement, Brink's notified Local 807 that it was withdrawing its recognition on the ground that the union's combined representation of guard and non-guard employees disqualified it from representing the guard employees pursuant to § 9(b)(3) of the Nation-

al Labor Relations Act ("NLRA"), 29 U.S.C. § 159(b)(3). Brink's authority to withdraw recognition of Local 807 was upheld by the National Labor Relations Board ("NLRB") on May 31, 1984. *See Wells Fargo Armored Services Corp.*, 270 N.L.R.B. 787 (1984). A parallel effort to compel arbitration of an issue under § 301 of the LRMA was rejected in *Local 807, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Brink's, Inc.*, 744 F.2d 283 (2d Cir.1984).

In this present action, plaintiffs seek contributions to the Fund based upon vacation and sick pay allegedly accrued under the terms of the agreement but not paid before the agreement expired. Article XXV(b) of the agreement defines the employer's contribution obligation as follows:

> "(b) Effective as of April 1, 1983, the EMPLOYER shall contribute to the Local 807 Labor Management Health Fund ("Health Fund") the amount of one dollar and fourteen cents ($1.14) per straight time hour for all hours paid to regular, full-time and extra [1] employees subject to a maximum of forty (40) hours per week, to provide the benefits prescribed by the Trustees of the Health Fund."

It is undisputed that contributions were paid into the Fund for all hours of vacation and sick time actually paid out to the regular and extra employees (the "unit employees") during the term of the agreement. Involved in this lawsuit are contributions allegedly due with respect to payments which would of necessity have been made for vacation time and sick time after the agreement terminated because of the provisions of the agreement relating to vacation and sick pay.

The terms of the agreement relevant to the issues raised by this lawsuit include the following. Under the agreement, vacation "credits" were calculated on the "basis of service performed during the preceding calendar year." Article XXI(a). Since all of the regular and extra unit employees had at least ten years of service as of December 31, 1983, each was entitled to four weeks paid vacation during calendar year 1984. Article XXI(c). The agreement further provided that, in the event of termination of an employee for any reason, "vacation pay for service performed during the current year shall be prorated and shall be paid at the time of termination, together with all vacation pay earned for service during the entire preceding calendar year which has not been previously taken or paid for." Article XXI(f).

With respect to sick pay, all regular and extra unit employees were entitled to a maximum of five days of sick leave per calendar year. Article XIX(a). If at the end of a calendar year an employee had unused sick days, he had the choice of either carrying over to the next calendar year a maximum of five "earned but unused" sick days or cashing them in for payment "at the prevailing rate of pay at the time when the days were accrued." Article XXI(b).

Subsequent to the expiration of the agreement, Brink's issued a new Fringe Benefit, Wage Rate and Working Conditions Plan which contained a savings provisions for the unit employees' 1984 vacation and sick pay entitlements. Those employees entitled to vacation or sick leave pay after March 18, 1984, for work performed during the term of the agreement have been paid by Brink's. However, no contributions to the Fund have been made with respect to those payments. As of October 1, 1984, benefit eligibility and Health Fund coverage for the regular and extra unit employees was terminated pursuant to the Fund's rules and regulations. According to plaintiffs, the unit employees received approximately $185,000 in benefits from the Fund between March 19 and September 30, 1984. The unit employees are now covered by a different plan selected by Brink's.

This action was commenced by plaintiffs on October 31, 1986. On September 14, 1987, this Court denied cross-motions for summary judgment and directed the par-

---

**1.** Extra employees are employees who are available for work five days a week but are regularly scheduled for a minimum of three days work per week. Article VIII(d).

ties to engage in additional discovery. Subsequent to such discovery, the parties again cross-moved for summary judgment. On November 23, 1988, this Court ruled that this matter could not be properly disposed of within the confines of Fed.R. Civ.P. 56. However, pursuant to the Court's proposal, the parties have stipulated to resolution of this matter on the record. Accordingly, they have submitted appendices, including deposition testimony and additional memoranda of law. On October 23, 1989, the parties appeared for oral argument before the Court on this matter. Subsequently, they stipulated that, if this Court finds in favor of the plaintiffs, the total amount of contributions due to the Fund is $33,565.25.

■ Defendant argues that this Court lacks subject matter jurisdiction to hear this case and that plaintiffs' cause of action is preempted. This Court rejected these arguments on prior motions and continues to find them without merit. What follows sets forth the reasons for this determination.

Plaintiffs invoke this Court's jurisdiction under ERISA § 502(a)(3)(B)(ii), which provides:

"A civil action may be brought by a participant, beneficiary, or fiduciary to obtain other appropriate relief to enforce any provisions of this subchapter or the terms of the plan."

More to the point, section 502(e)(1) provides:

"[T]he district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, or fiduciary."

Defendant argues that this Court lacks subject matter jurisdiction to hear plaintiffs' claim because it is preempted by the National Labor Relations Act and is within the exclusive jurisdiction of the NLRB. Defendant relies heavily on the United States Supreme Court's decision in *Laborers Health and Welfare Trust Fund for Northern California v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 108 S.Ct. 830, 98 L.Ed.2d 936 (1988). In that

case, the union/management contract had expired, and negotiations for a renewal of the contract were under way. Management ceased making contributions into the welfare fund during the negotiations. As here, the union brought suit under ERISA. But unlike this case, plaintiff in that one contended that defendant's conduct was an "unfair labor practice," violating NLRA § 8(a)(5)'s duty to bargain in good faith and maintain the status quo during the negotiations. The Supreme Court affirmed the district court's conclusion that the NLRB had exclusive jurisdiction, holding that ERISA § 515 was not intended to allow enforcement by the district courts of statutory duties created by the NLRA but only for the enforcement of contractual promises.

Here, by contrast, plaintiffs' claim is squarely based on the agreement itself, not on the NLRA. Unlike the defendant in *Advanced Lightweight*, management here had no duty under the NLRA to continue the status quo pending renewal negotiations, because, as the NLRB ruled, it had rightfully withdrawn recognition of the union under NLRA § 9(b)(3). Defendant points to nothing else in NLRA §§ 7 or 8 that governs the welfare fund contributions at issue here. The previously decided question of whether management's withdrawal of recognition of the union was permissible under NLRA § 9(b)(3) is a separate issue. It did not decide whether the agreement's requirement of vacation and sick pay related benefit contributions applied to vacation and sick pay disbursed after the agreement's expiration date.

The complaint in this action makes no reference to the NLRA or to unfair labor practices. Plaintiffs commenced this action to enforce the terms of the agreement. Plaintiffs had previously presented a more vague version of the benefit contributions issue to the NLRB in the form of an NLRA complaint, but the NLRB ruled that management's conduct did not violate the NLRA. This ruling has no effect on plaintiffs' ERISA claim.

Defendant also relies on language from the Second Circuit's decision on the arbitra-

tion dispute holding that issues concerning the union's representative status are within the exclusive jurisdiction of the NLRB. *Local 807*, 744 F.2d at 286, 287. This reliance is misplaced because the Second Circuit said nothing about the benefit contributions issue. The only issue before it was whether arbitration could be compelled on the issue of withdrawal of recognition.

Finally, defendant seizes on two phrases from the Supreme Court's *Advanced Lightweight* decision. It argues that the obligation sought to be enforced here is not a "simple collection action," 484 U.S. at 551, 108 S.Ct. at 837, but rather that there is a "good-faith dispute over both the existence and the extent of the employer's liability," *id.* at 552, 108 S.Ct. at 837, and that *Advanced Lightweight* disavows allowing ERISA enforcement of such obligations. This argument takes the Court's words out of context. The phrases are taken from the Court's discussion of the policy behind its holding and are in-passing characterizations of contract-based as opposed to NLRA-based claims. Furthermore, the Court did not imply that ERISA enforcement of even complicated contract-based claims is never appropriate; it merely observed that some of ERISA's severe remedies are "problematic." 484 U.S. at 552, 108 S.Ct. at 837. Even if defendant is correct that plaintiffs' contract-based claim here is complicated, the fact remains that *Advanced Lightweight* only bars jurisdiction over NLRA-based claims. This court can therefore adjudicate this ERISA claim.

■ Defendant next challenges this Court's subject matter jurisdiction over this case on the ground that plaintiffs have not invoked LMRA § 301. That statute, the fountainhead of the federal common law of labor, *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), provides in pertinent part:

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organization, may be brought in any district court of the United States having juris-

diction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

Plaintiffs ask this Court to interpret the collective bargaining agreement but do not mention this statute in their complaint. Defendant asserts that this statute is the exclusive jurisdictional basis on which this Court can consider plaintiffs' claim. However, its only authority are cases holding that the statute preempts state law causes of action. *See, e.g., Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985); *Lincoln Mills, supra; National Metalcrafters v. McNeil*, 784 F.2d 817, 824 (7th Cir.1986). There is no authority for the proposition that § 301 preempts federal causes of action, such as plaintiffs' ERISA claim.

■ Even if defendant's premise were correct, plaintiffs' invocation of jurisdiction under ERISA rather than LMRA § 301 would not be fatal to their action. The Court has the power to permit plaintiff to cure defective jurisdictional allegations by granting leave to file an amended complaint. *See, e.g., Sims v. Mercy Hospital of Monroe*, 451 F.2d 171 (6th Cir.1971). *See also* 5 Wright and Miller, *Federal Practice and Procedure* § 1214 n. 55.

■ Defendant next repeats its contention, already rejected by this Court, that plaintiffs have failed to state a claim because § 302(c)(5)(B) of the LMRA prohibits employer contributions to a fund unless "the detailed basis on which such payments are to be made is specified in a written agreement with the employer."

The purpose of this statute is to ensure that management payments do in fact benefit the employees. In this case, the written agreement, although now expired, provided in theory for certain payments to be made after expiration based on services performed before expiration, satisfying both the purpose and the literal language of the statute.

■ Defendant also argues that it it is prohibited from making payment to plaintiffs by LMRA § 302(c)(1) unless it falls within the exception created by the main

leg of LMRA § 302(c)(5). This exception permits employer payments to unions only "for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents)."

Defendant asserts that, because the agreement between Brink's and the Local is no longer in effect, any contributions defendant would have been required to make to the Fund after the expiration of the agreement would as a factual matter inure not to the "sole and exclusive benefit" of Brink's employees but rather to employees of other companies still represented by the Local or to the Fund itself. This assertion would have been true only if the terms of the Fund included no mechanism by which formerly participating employees could collect benefits from contributions later made on their behalf.

The agreement called for Brink's to make contributions to the trustees of the Local 807 Health Fund "on behalf of" employees. This Fund is governed by a separate Agreement and Declaration of Trust, Section 3 of which defines "participant" as "any Employee or former Employee of an Employer who is or may become eligible to receive a benefit of any type from this Fund or whose Beneficiaries may be eligible to receive any such benefit." The phrase "eligible to receive a benefit" is not defined. Nor does the Trust specify anywhere else how the recipients of benefits are determined.

The Brink's employees were able to benefit from the Fund after the expiration of the agreement. Therefore, if defendant had made the contributions in question, its employees would have benefited. Defendant concedes that the Fund retained the discretion to allocate benefits among participants. Plaintiffs continued to be covered by the Fund's benefit schedule through September 30, 1984, over six months after the collective bargaining agreement's expiration date. The employees received reimbursements of approximately $185,000

from the Fund on claims subsequent to March 18, 1984. Accordingly, defendant is not entitled to judgment on this ground.

Defendant also argues that ERISA is inapplicable to this case. Section 515 of ERISA provides:

"Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement."

Defendant's assertion is simply that it has no obligation under this section because the "collectively bargained agreement" to which it refers has expired. However, whether defendant has a current obligation which survived the expiration of the agreement is precisely the issue to be decided in this case. If plaintiffs are entitled to prevail, then they meet the requirements of Section 515.

In sum, this Court does have jurisdiction to decide this matter, and plaintiffs' cause of action is not preempted.

Interpretation of collective bargaining agreements is governed by federal common law and by state common law principles to the extent compatible with federal labor policy. *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). In an action to recover delinquent contributions under ERISA § 515, plaintiffs bear the burden of demonstrating by a preponderance of the evidence that the agreement obligated defendant to make the contributions in question to the Fund.

█ Contract clauses should, if at all possible, be interpreted on the basis of their plain and literal meaning. *NLRB v. United Technologies Corp.*, 884 F.2d 1569, 1575 (2d Cir.1989). Where a contractual provision is ambiguous, the court may consider parol evidence to ascertain the intent of the parties.

The agreement required defendant to contribute to the Health Fund "for all hours paid" to the unit employees. Article XXV(b). In one sense, of course, the hours

at issue were, prior to the expiration of the agreement on March 18, 1984, "paid hours," hours paid for by wages earned and vacation time and sick pay accrued. In another sense, however, the hours were not paid because the compensation in the form of sick or vacation pay had not been put into the hands of employees before March 18, 1984. The language of the clause of the contract is, thus, ambiguous. Accordingly, parol evidence is appropriately looked to in order to resolve the ambiguity and determine the intent of the parties at the time of the formation of the contract. While there is no evidence that the question at issue was expressly considered by any one at the time of the negotiation of the agreement, circumstantial evidence concerning the contract as a whole and the parties' practices throws light on the parties' intentions.

Fringe benefit payments to employees for past services are, of course, the equivalent of wages to the bargaining unit employee and the employer. *See, e.g., In re Willow Cafeterias, Inc.,* 111 F.2d 429, 432 (2d Cir.1940). Vacation pay and sick pay are alternate forms of compensation whose receipt is delayed. Under the agreement at issue in this case, an employee who had served at least ten years, as all of the employees relevant to this case had, was entitled to four weeks paid vacation during calendar year 1984, based on service performed in 1983. The agreement also provided that in the event of termination for any reason, "vacation pay for service performed during the current year shall be prorated and shall be paid at the time of termination, together with all vacation pay earned for service during the entire preceding calendar year which has not been previously taken or paid for." Article XXI(f). With respect to sick pay, each employee

was entitled to a maximum of five days of sick leave per calendar year. Article XIX(a). At the end of a calendar year, an employee had the choice of either carrying over "earned but unused" sick days to the following year or cashing them in for payment "at the prevailing rate of pay at the time when the days were accrued." Article XXI(b).

■ Defendant's argument that, after the termination date of the agreement, it had no contractual obligation to pay the unit employees vacation pay or sick pay (or the equivalent) based on work performed during the life of the agreement and that any payments it did make were not "under the Agreement" but represented payments under a new plan or a form of settlement with its employees borders on the frivolous. Whether or not such payments were in fact made by defendant, defendant had a contractual obligation to make those payments to the unit employees. Where an employee performs his or her work on the employer's promise of wages and fringe benefits, the employee is entitled to receive not only the wages but the benefits earned for work performed during the contract period, even if they are not to be placed in the hands of the employee or "paid" in that sense until after the expiration of the contract. On March 18, 1984, the date of expiration of the agreement, the employees had a vested right to a fixed amount of vacation and sick pay which was earned as a result of work performed during the term of the agreement, and the fact that the defendant did not fulfill its obligations until after that date does not mean that the payments are any less payments for hours covered by the agreement.[2]

---

**2.** Defendant claims that health and welfare benefits are not capable of being "accrued" and "vested," relying on *Moore v. Metropolitan Life Insurance Co.,* 856 F.2d 488 (2d Cir.1988), and that therefore contributions to fund that benefit cannot be accrued and vested. "Accrual" and "vesting" are terms of art in the ERISA field. *See, e.g., Stewart v. National Shopmen Pension Fund,* 730 F.2d 1552, 1561–62 (D.C.Cir.), *cert. denied,* 469 U.S. 834, 105 S.Ct. 127, 83 L.Ed.2d 68 (1984); 29 U.S.C. § 1002(23). Defendant asserts that these terms are not properly applicable to the benefit payments at issue, but this contention does not eliminate defendant's obligations under the contract. Plaintiffs use the terms "accrued" and "vested" simply to assert that the benefits have been earned and are owing, not as terms of art. In this sense of the terms, plaintiffs are correct that the unit employees' vacation and sick leave pay was "accrued" and "vested."

The testimony of Joseph Votta, the Local 807 Business Agent who negotiated the agreement on behalf of the unit employees, does not undercut plaintiffs' position. Defendant points to Votta's testimony that he does not "negotiate for after the agreement expired" and that "every contract is only for the term of the agreement." However, although the agreement may have expired, plaintiffs do not claim that the obligations arose out of some continuation of the contract.

Payment to the Health Fund was a contractual obligation before termination. Even though the date of expiration of the agreement passed, defendant was bound to make contributions. The computation of all contribution payments that were due under the agreement could have been made on or before March 18, 1984. While under the parties' usual practices, contributions were made on a month-to-month basis and contributions based on vacation and sick pay were only made when that pay was actually received by the unit employees, this did not exempt defendant from making the final contributions that were due pursuant to the agreement. In this context, the "hours paid" language encompasses benefits that were earned as of that time, though payment in the sense of the transfer of funds was delayed because of the parties' practices and procedures until after the expiration date of the agreement.

■ Defendant argues that, even if the employees were deprived of additional wages, the Fund has no standing to enforce the agreement to claim "wages," and the employees would have to proceed under the Fair Labor Standards Act or the New York wage payment law, not ERISA, because the employees were not deprived of anything but in fact received their wages, vacation and sick payments, and health and welfare benefits, including by plaintiffs' account roughly $185,000 from the Fund after the expiration of the agreement.

However, as a third-party beneficiary, the Fund, through its trustees, does have standing to enforce defendant's promise to the unit employees to make certain payments to the Fund on behalf of the employ-ees. The fact that the employees received reimbursement of their health claims from the Fund only means that the employees have no cause of action against the Fund. It does not mean that the Fund is not entitled to payments that the defendant was contractually obligated to make to it. On the contrary, if anything, the fact that the unit employees continued to receive benefits from the Health Fund from March 19 to September 30, 1984, in fact supports to plaintiffs' argument. Nothing in the agreement modifies the phrase "hours paid" by placing a limitation upon the time of payment.

Plaintiffs have put forward the most reasonable interpretation of defendant's contractual obligations. They have satisfied their burden of proving that the terms of the agreement required defendant to make contributions to the Health Fund based on vacation and sick leave pay that was earned as compensation for work performed on or before March 18, 1984. Accordingly, defendant is liable to plaintiffs for the amount of those contributions.

■ The parties have stipulated that the amount of contributions due to the Fund, if this Court finds for the plaintiffs, is $33,-565.25. Plaintiffs also seek an award of interest, attorney's fees, and costs. Section 502(g)(2) of the Employment Retirement Income Security Act, 29 U.S.C. § 1132(g)(2), provides:

"In any action under this subchapter for or on behalf of a plan to enforce section 1145 of this title [delinquent contributions] in which a judgment in favor of the plan is awarded, the court shall award the plan—(A) the unpaid contributions, (B) interest on the unpaid contributions, (C) an amount equal to the greater of—(i) interest on the unpaid contributions, or (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent ... of the amount determined by the court under subparagraph A, ... [and] (D) reasonable attorney's fees and costs of the action, to be paid by the defendant."

29 U.S.C. § 1132(g)(2). This provision also states that "interest on unpaid contribu-

tions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26." The award of liquidated damages or double interest is mandatory where a fiduciary prevails in an action to enforce contributions under § 515 of ERISA. *See Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148 (7th Cir.1989) (*en banc*).

Neither the agreement nor the Fund's Trust contains a provision specifying an amount of liquidated damages or a rate of interest. Accordingly, plaintiffs are entitled to double interest on the unpaid contributions from March 19, 1984, as calculated under 26 U.S.C. § 6621, reasonable attorney's fees, and costs.

Plaintiffs' counsel is directed to submit its contemporaneous time records, documentation of its costs, and a proposed judgment.

SO ORDERED.